CITY LINE JOINT VENTURE, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 96–738C.

United States Court of Federal Claims.

March 15, 2001.

Gerson B. Kramer, Braude & Margulies, P.C., Washington, D.C., attorney of record for plaintiff.

John E. Kosloske, with whom were Acting Assistant Attorney General David W. Ogden and Director David M. Cohen, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, D.C., for defendant. Associate General Counsel Carole W. Wilson, Assistant General Counsel Angelo Aiosa, Trial Attorney Terri L. Roman, and Associate Field Counsel Kevin Carlin, Department of Housing and Urban Development, of counsel.

## OPINION

WIESE, Judge.

The question presented in this case is whether the Department of Housing and Urban Development ("HUD") breached its mortgage contract with plaintiff when, on the basis of restrictions announced in subsequent legislation, it denied plaintiff's request to prepay the mortgage. Having given careful consideration to the written submissions of both parties, as well as to the oral arguments presented to the court, we hold that there was no breach of contract.

## BACKGROUND

### The Parties and the Mortgage

Plaintiff, City Line Joint Venture ("City Line"), is the owner of a 283–unit rental housing project known as "The Prestridge" located in Suitland, Maryland. The Prestridge was constructed in 1968 using below-market financing made available through the Riggs National Bank of Washington ("Riggs"), pursuant to a federal mortgage insurance program established under Section 221(d)(3) of the National Housing Act, Pub.L. 83–560, 68 Stat. 590, 599–601 (1954) (codified as amended at 12 U.S.C. § 1715$l$(d)(3) (1994)) ("Section 221 program"). An initial loan was made in 1968 and a supplemental loan was added in 1971. The loans were consolidated, and after the final loan documents were signed on August 2, 1971, HUD, acting as the loan's insurer, officially endorsed the mortgage note on August 30th of that year. Contemporaneous with HUD's endorsement of the note, Riggs sold and assigned the mortgage loan to the Government National Mortgage Association, popularly known as Ginnie Mae.

As a condition to participation in the Section 221 program, housing developers, like plaintiff, were required to sign a regulatory agreement that enumerated the terms and conditions under which they would be permitted to operate. Included among these terms and conditions were "affordability restrictions," i.e., restrictions on project rents as well as on project rates of return. By its terms, the regulatory agreement was to remain in effect until the mortgage loan was repaid. Although the standard mortgage extended for a term of 40 years, HUD regulations permitted project owners to prepay their mortgages without agency approval after a period of 20 years. Exercise of the right of prepayment correspondingly terminated HUD's regulatory control over the project.

As is typically the case, the regulatory agreement between City Line and HUD was silent about the project owner's prepayment

rights. However, a right of prepayment was included as part of the secured note: [1]

> The debt evidenced by this note may not be prepaid either in whole or in part prior to 20 years from the date of final endorsement of this note by the Federal Housing Commissioner without the prior written approval of the Commissioner; thereafter, the debt evidenced by this note may be prepaid either in whole or in part without the approval of the Commissioner.

Ginnie Mae remained the holder of the mortgage note until 1977—the year in which plaintiff defaulted on its mortgage. Following the default, Ginnie Mae submitted an application for insurance benefits to HUD and, as part of the application, assigned its interest in the defaulted mortgage to that agency. Thus, HUD became the holder of plaintiff's mortgage.

Under the terms of plaintiff's mortgage loan, HUD could have foreclosed on the Prestridge project. Instead, at plaintiff's request, HUD entered into a series of loan work-out arrangements with City Line, during which time plaintiffs sought to pay the accumulated arrearages on the mortgage note and restore the project to a sound financial footing. These efforts were complicated by higher than expected building maintenance and management costs occasioned by, among other things, low occupancy rates and tenant abuse of the premises.[2]

On January 1, 1985, nearly seven years after HUD was first assigned the Prestridge mortgage, City Line and HUD entered into a Modification of Note and Deed of Trust ("Modification Agreement"). By the terms of this modification, the parties agreed that, in consideration of plaintiff's payment of $200,513 in deferred principal payments, HUD would eliminate the default and restructure the payments that remained owing on the loan balance. In addition, the Modification Agreement provided:

> Nothing herein contained shall in anywise impair the Note or the security now held for said indebtedness, it being the intent of the parties hereto that the terms and provisions of said Note and Mortgage shall continue in full force except as modified hereby.

*Legislation*

In the late 1980s, Congress became concerned about the future availability of low and moderate-income housing. Legislative attention focused on the fact that many project owners then participating in the Section 221 program could be expected to exercise the prepayment privileges in their loan agreements, thereby creating the possibility of a sudden and acute shortage in the nation's stock of affordable rental housing. *See* S.Rep. No. 101–316, at 105 (1990), *reprinted in* 1990 U.S.C.C.A.N. 5763, 5867–79. To address this concern, Congress enacted the Emergency Low Income Housing Preservation Act of 1987 ("ELIHPA"), Pub.L. No. 100–242, 101 Stat. 1877 (relevant sections reprinted at 12 U.S.C. § 1715*l* note (1988)).

ELIHPA was enacted as temporary legislation with provisions set to expire two years after the law's enactment. The act required that an owner seeking to prepay a mortgage insured or held by HUD first file a "notice of intent" and, upon receipt of certain information from HUD, file a "plan of action" with the agency. Before HUD could approve such a plan of action, however, ELIHPA required the agency to make written findings demonstrating that implementation of the plan would not adversely affect current tenants, nor materially affect the availability of decent, safe, and sanitary housing to low-income persons residing within the housing market served by the owner's project. *See*

---

1. The right of prepayment that was set out in the note reflected contemporaneous HUD regulations governing the Section 221 program, 24 C.F.R. § 221.521(a)(ii)(1970). Those regulations also contained language reserving to HUD the right to make future amendments, subject, however, to the restriction that any "such amendment shall not adversely affect the interests of a mortgagee or lender under the contract of insur- ance on any mortgage or loan already insured." 24 C.F.R. § 221.749 (1970).

2. To prevent an immediate foreclosure, plaintiffs sought and found a new investor for the project, Brunswick Management Company. Brunswick made a capital contribution to the project of $129,000. Despite these additional funds, however, the project continued to falter.

ELIHPA § 225(a), 12 U.S.C. § 1715*l* note (1988) (current version at 12 U.S.C. § 4112 (1994)). In practice, satisfying these requirements was difficult. Of all the projects affected by the legislation, only eight owners applied for prepayment approval under ELIHPA. Of these, HUD approved only three.

In 1990, shortly prior to the expiration of ELIHPA, Congress enacted the Low–Income Housing Preservation and Resident Homeownership Act of 1990 ("LIHPRHA"), Pub.L. No. 101–625, 104 Stat. 4249 (codified as amended at 12 U.S.C. § 4101 *et seq.* (1994)). Like its predecessor, LIHPRHA expressly conditioned the prepayment of all Section 221 program mortgage loans on HUD approval.

*Notice of Intent to Prepay*

On December 19, 1990, plaintiff's managing partner filed a notice of intent to prepay its mortgage loan with HUD. The application, however, was never approved. Accordingly, plaintiff remained a participant in the Section 221 program until enactment of the Housing Opportunity Program Extension Act of 1996 ("HOPE"), Pub.L. 104–120, § 2, 110 Stat. 834 (relevant sections reprinted at 12 U.S.C. § 4101 note (1996)). HOPE effectively repealed the prepayment restrictions imposed by LIHPRHA by permitting Section 221 program project owners to prepay their mortgage loans without HUD approval so long as the owners agreed not to raise rents for a period of 60 days following prepayment. Acting under the authorization provided by HOPE, plaintiff prepaid its mortgage on August 3, 1997.

In November 1996, a year before it received relief under HOPE, plaintiff filed a complaint in this court alleging that HUD's refusal to allow the prepayment of the mortgage in December 1990, amounted to a breach of contract—a charge which HUD denies. It is this issue—the resolution of which was postponed for a period of time to await the outcome of proceedings in related cases—that is now before us on cross-motions for partial summary judgment.

## DISCUSSION

■ In our analysis of this problem, we start with a basic rule of contract law: where the performance of a duty is made impracticable because of governmental action occurring after the contract was entered into, the duty is discharged unless the circumstances or contract language indicate otherwise. *See* Restatement (Second) of Contracts §§ 261, 264 (1979). The rule is based on the general understanding that a contract is formed against a background of certain basic assumptions, including the presumption that "the law will not directly intervene to make performance impracticable when it is due." Restatement § 264 cmt. a. It is defendant's reliance on this rule as its defense in this case that shapes the boundaries of the present dispute.

■ In the assertion of its breach claim, plaintiff does not dispute that the Government, as a contracting party, is accorded the same rights as a private party to a contract. *Perry v. United States,* 294 U.S. 330, 352, 55 S.Ct. 432, 79 L.Ed. 912 (1935) ("When the United States ... makes contracts ... it has rights and incurs responsibilities similar to those of individuals who are parties to such instruments."). In plaintiff's view, however, the Government may not invoke an impossibility defense to excuse its contract performance where the legislation proscribing that performance directly targets the contract in question. LIHPRHA, plaintiff contends, represents such a case.

In support of its position, plaintiff refers us to the decision in *United States v. Winstar Corp.,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). There, in addressing the Government's right to invoke a change in law as a defense to a breach of contract claim, the Court explained that legislative enactments can provide the foundation for an impossibility defense only where their "impact upon public contracts is ... merely incidental to the accomplishment of a broader governmental objective." *Id.* at 898, 116 S.Ct. 2432. The Court went on to explain, however, that where "a substantial part of the impact of the Government's action rendering performance impossible falls on its own contractual obligations, the defense will be unavailable." *Id.* at 898, 116 S.Ct. 2432.

Plaintiff maintains that the statute at issue here, LIHPRHA, did not incidentally affect its mortgage contract with HUD (referring to the Modification Agreement of June 1, 1985) but, rather, did so directly and immediately by extinguishing the unrestricted right to prepayment of the mortgage. Consequently, plaintiff argues, LIHPRHA must be seen as an exercise in governmental self-help—the implementation of broad social objectives at the expense of a private contract right—and therefore the statute may not now be invoked by HUD in defense of a claim of breach.

Defendant offers a two-fold response to plaintiff's argument. It contends, first, that when HUD entered into the Modification Agreement with plaintiff on June 1, 1985, it did no more than step into the shoes of the original contracting party, the Riggs Bank. Therefore, defendant maintains, it possesses all of the rights and responsibilities—including contract defenses—held by the original contracting party. Since plaintiff's contract with Riggs did not contain a promise by Riggs to assume the risk of impossibility of performance occasioned by a change in law, neither, defendant argues, may HUD be held to such a promise.

Defendant goes on to say that even if HUD is not entitled to claim a derivative contract status, but must instead be viewed as a contracting party in its own right, it is nevertheless entitled to invoke LIHPRHA in defense of plaintiff's breach claim. This result follows, defendant contends, because the statute was public and general in character, rather than one targeted primarily at government contracts. The statute's restrictions on prepayment, in other words, affected mortgages held by HUD as well as by private lending institutions and state agencies.

Of the two arguments defendant presents, only the second can succeed. The difficulty with the first argument is that it is inconsistent with the reasoning in *Winstar.* That decision's instruction that legislation must be relatively free of governmental self-interest in order to be cognizable for purposes of a legal impossibility defense, is intended to insure that the Government not exploit its status as a sovereign by enacting legislation favorable to its status as a contractor. "[A]llowing the Government to avoid contractual liability merely by passing any 'regulatory statute' would flout the general principle that, '[w]hen the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals.'" *United States v. Winstar,* 518 U.S. at 895, 116 S.Ct. 2432 (quoting *Lynch v. United States,* 292 U.S. 571, 579, 54 S.Ct. 840, 78 L.Ed. 1434 (1934)). Any incentive the Government might have to rid itself, through legislation, of the burden of unwanted contract obligations would not be diminished simply because it holds those obligations as an assignee rather than as a party that had contracted in its own right. For this reason then, we reject defendant's first argument.

Turning to defendant's second argument, we agree that LIHPRHA is properly characterized as a public and general act rather than as an act intended to relieve the Government of its own contractual obligations. We base that conclusion on two factors: the statute's reach and its impact. As to the first factor, the statute extends to all loans or mortgages "insured or held by the Secretary" pursuant to the low-income housing provisions of the National Housing Act. 12 U.S.C. § 4119(1) (1994). The act therefore encompasses both publicly and privately-held financing commitments. As to the second factor, there is no evidence to suggest that the act, as applied, predominately impacts HUD-held mortgages as opposed to those in private hands. Indeed, the contrary may be assumed, for HUD's involvement in these transactions is primarily that of mortgage insurer rather than of mortgage lender.

Plaintiff disagrees with our conclusion. Plaintiff maintains that even if the statute predominately affects private contracts, it may not be regarded as general legislation because it also impacts directly upon contracts to which the Government is a party. According to plaintiff, only that legislation which indirectly affects government contracts deserves to be called public and general.

We do not agree with this contention. In *Winstar,* the Court made it clear "that a governmental act will not be public and gen-

eral if it has the substantial effect of releasing the Government from its contractual obligations." 518 U.S. at 899, 116 S.Ct. 2432. We take this pronouncement to mean that the characterization of a statute—whether it is to be regarded as public and general as opposed to being attributable to the Government as a contractor—is to be determined according to its impact. If the burden of the statute falls principally upon private contracts (which we assume is the case here) then the statute is public and general and may be invoked by the Government as an excuse to contract performance. We find that to be the case here, and conclude that the Government's impossibility defense applies.[3]

## CONCLUSION

For the reasons stated, plaintiff's motion for partial summary judgment is denied and defendant's cross-motion for partial summary judgment is granted.

---

**3.** In *Winstar*, the Court explained that, in order for the Government successfully to invoke the defense of impossibility of performance based on an intervening change in law, it would also have to show that it had not assumed the risk of such a change. "For a successful impossibility defense the Government would have to show that the nonoccurrence of regulatory amendment was a basic assumption of these contracts." 518 U.S. at 905, 116 S.Ct. 2432. However, no argument is made here that plaintiff's contract with the Riggs Bank, and later its contract with HUD, either expressly or impliedly transferred the risk of legislative change to plaintiff's contracting partners. Hence, we do not further examine the issue.