**Alexander INVESTMENT,
et al., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

No. 96–325C.

United States Court of Federal Claims.

Dec. 5, 2001.

Mark P. Levy, Levy, Levy & Levy, Larkspur, CA, for plaintiff.

John E. Kosloske, United States Department of Justice, Washington, D.C., for defendant.

## OPINION and ORDER

HODGES, Judge.

This is a claim for a taking under the Fifth Amendment of the United States Constitution. Plaintiffs are participants in a government program to encourage the development of low-income housing. They allege that contractual rights to prepay government-insured mortgages on their properties were taken by passage of the Emergency Low Income Housing Preservation Act of 1987 and the Low Income Housing Preservation and Resident Homeownership Act of 1990. Plaintiffs did not have compensable property rights for purposes of the Fifth Amendment because regulations authorizing the program reserved to the Department of Housing and Urban Development the right to amend those regulations at any time. We grant defendant's motion for summary judgment.

## I. BACKGROUND

Congress authorized the Federal Housing Administration through the National Housing Act of 1934, and later the Department of Housing and Urban Development, to insure the mortgages of private developers of low-income housing. National Housing Act, ch. 847, 48 Stat. 1246 (1934) (codified as amended at 12 U.S.C. §§ 1701–1750g (2000)). This enabled private lending institutions to provide low-interest mortgages to developers who would agree to build such housing through a program known as Section 221. 24 C.F.R. § 221.542 (1970). *See Cienega Gardens v. United States*, 194 F.3d 1231, 1234 (Fed.Cir.1998) (*Cienega II* ).

Developers also could receive interest subsidies on market-rate mortgages through the rental and cooperative housing program for lower income families, known as Section 236. 24 C.F.R. § 236.30 (1970). Under that program, developers would "operate the project in accordance with such requirements with respect to tenant eligibility and rents as the Secretary may prescribe." *Id.* The eligibility requirements for Section 236 mortgage insurance are found at 24 C.F.R. § 236.1 (1970).

Both programs involved participation among HUD, a bank or other private lending institution, and the developer or owner. HUD issued a "Commitment for Insurance of Advances" to the bank, guaranteeing its loan to the developer of low-income housing for a term of 40 years subject to the regulations then in effect. The Commitment required the developer to sign a separate "Regulatory Agreement" with HUD. That agreement permitted the Government to regulate "rents, charges, and methods of operation" of the development.

The lender and the developer typically executed a mortgage and a secured note at closing.[1] HUD would endorse the note and agree to provide mortgage insurance for the lender. The developer executed the Regulatory Agreement referred to above, and agreed to certain "affordability restrictions" that limited the rental rates it charged tenants. The mortgage loan insurance contract and the Regulatory Agreement were to remain in effect so long as the loan remained outstanding.

### A.

When the Agreements were executed, the eligibility requirements for both programs permitted owners or developers to prepay their mortgages without HUD's approval after twenty years from the date of endorsement. 24 C.F.R. §§ 221.524, 236.30 (1970). The right of prepayment that was set out in the note reflected contemporaneous HUD regulations governing the Section 221 and Section 236 Programs. 24 C.F.R. §§ 221.524(a)(ii), 236.30(a)(i) (1970). Those regulations also contained language reserving to HUD the right to future amendments, subject only to the restriction that "such amendment shall not adversely affect the interests of a mortgagee or lender under the contract of insurance on any mortgage or loan already insured." 24 C.F.R. § 221.749 (1970). The prepayment provision was not in the Regulatory Agreement but in the note issued by the bank. The agreement between plaintiffs and HUD did not mention developers' prepayment rights.

Plaintiffs' notes with the banks included this provision:

> The debt evidenced by this note may not be prepaid either in whole or in part prior to the final maturity date hereof without the prior written approval of the Federal Housing Commissioner except a maker which is a limited dividend corporation may prepay without such approval after 20 years from the date of final endorsement

of this note by the Federal Housing Commissioner.

The prepayment provisions in the notes tracked regulations in effect at the time. The regulations permitted prepayment after twenty years without HUD approval, subject to amendment as noted. *Cienega II*, 194 F.3d at 1244.

### B.

In the late 1980s, Congress became concerned that nearly one million low-income housing units soon would be lost to developers' exercise of their prepayment rights. These units included those insured under Sections 221 and 236 of the National Housing Act, those produced with assistance under section 8 of the United States Housing Act of 1937, and rural units financed under section 515 of the Housing Act of 1949. 12 U.S.C. § 1715*l*; 12 U.S.C. § 1715z–1; and 42 U.S.C. § 1437f. Congress determined that the loss of this federally assisted low-income housing "would inflict unacceptable harm on current tenants and would precipitate a grave national crisis in the supply of low income housing that was neither anticipated nor intended when contracts for these units were entered into." Pub.L. No. 100–242, 101 Stat. 1877 (1987) (codified at 12 U.S.C. § 1715*l* (note) (1989)).

Congress passed the Emergency Low Income Housing Preservation Act of 1987 (ELIHPA) to address this concern. *Id.* ELIHPA provided that a developer or owner of Section 221 or 236 property could prepay its mortgage only in accordance with a plan of action approved by HUD. *Id.* Owners would file a notice of intent to prepay, and HUD would provide to the owner the information that it needed to prepare a plan of action.

ELIHPA permitted HUD to approve prepayment only if the owner could satisfy certain conditions. These conditions ensured that the impact of prepayment on current low-income tenants would be minimal and

---

1. The effect of these documents was summarized in *Cienega II*, 194 F.3d at 1234: "The note evidenced a loan made to the owner pursuant to a loan agreement between the owner and the lending institution that contemplated advances to the owner. Payment of the indebtedness evidenced by the note was secured by a deed of trust, or a mortgage, on the subject property. The note and deed of trust were printed on forms approved by HUD, and HUD endorsed the note as part of its mortgage insurance."

that a sufficient supply of comparable housing would remain in the area. ELIHPA § 225(a).[2] ELIHPA authorized HUD to provide the owner with financial incentives "to provide fair return on the investment to the owner" in exchange for the continued use of the property as low-income housing. ELIHPA § 225(b)(1). Such incentives were appropriate if they were shown to be necessary to provide an owner with a fair return on its investment, provided that they were the least costly means for the United States to insure an adequate supply of low-income housing.

Two years later, Congress replaced ELIHPA with the Low Income Housing Preservation and Resident Homeownership Act of 1990 (LIHPRHA). See Pub.L. No. 101–625, 104 Stat. 4249, (codified and amended at 12 U.S.C. § 4101–4147 (1994)). LIHPRHA extended the prohibition on prepayment without HUD's approval. "Any prepayment of a mortgage on eligible low-income housing or termination of the mortgage insurance on such housing not in compliance with the provisions of [LIHPRHA] shall be null and void and any low-income affordability restrictions on the housing shall continue to apply to the housing." Id.[3]

### C.

Plaintiffs submitted a "Notice of Intent to Prepay" in accordance with HUD's regulations implementing ELIHPA. The notice explained that plaintiffs intended to prepay the mortgage, stating "to achieve the financial objectives of the investment . . . [t] he

project will be operated as an investment property and current market rental rates will be charged." Plaintiffs submitted a plan of action to HUD requesting permission to prepay and thus terminate the low-income affordability restrictions. HUD denied their request to prepay.

Plaintiffs submitted a revised plan of action to HUD requesting financial incentives in exchange for the continuation of affordability restrictions on the property, and HUD amended the original Regulatory Agreement. The incentives permitted plaintiffs to distribute surplus cash so long as they certified that the development was maintained in good repair and condition, and to distribute the proceeds of a Section 241(f)[4] equity loan. 12 U.S.C. § 1715z–6 (repealed 1996). Plaintiffs obtained a Section 241(f) loan to be repaid over a term of 40 years with interest at the rate of 8–7/8% per year. They entered into a separate Regulatory Agreement imposing affordability restrictions on the property for the term of the mortgage insurance.

### D.

Plaintiffs sued the United States in this court for breach of contract and for a Fifth Amendment taking of their contract rights and investment-backed expectations. They allege that the taking occurred on the date that "each Plaintiff could have prepaid their respective Note and Mortgage at will but was unable to prepay." HUD breached their contracts because it would not allow them to

---

**2.** Section 225(a) provided the following criteria for determining whether to grant approval of a plan of action involving termination of low-income affordability restrictions:

(1) implementation of the plan of action will not materially increase economic hardship for current tenants or involuntarily displace current tenants (except for good cause) where comparable and affordable housing is not readily available; and

(2)(A) the supply of vacant, comparable housing is sufficient to ensure that such prepayment will not materially affect—

(i) the availability of decent, safe, and sanitary housing affordable to lower income and very low-income families or persons in the area that the housing could reasonably be expected to serve;

(ii) the ability of lower income and very-low-income families or persons to find afforda-

ble, decent, safe, and sanitary housing near employment opportunities; or

(iii) the housing opportunities of minorities in the community within which the housing is located.

**3.** LIHPRHA made slight modifications to the criteria under which HUD could allow prepayment or grant financial incentives. We do not address those differences because both plaintiffs processed their prepayment requests and their requests for financial incentives under ELIPHA.

**4.** The Section 241(f) loan program was a HUD incentive program that insured loans made by lending institutions to owners of low-income housing. Plaintiffs obtained secondary financing to be insured by HUD's section 241(f) loan program.

prepay their mortgages after 20 years, plaintiffs claim. They seek an award of just compensation for the "public use" of their property from the twenty-year maturity date to the date that plaintiffs received their Section 241 equity take-out loans.

## II. DISCUSSION

Plaintiffs allege that passage of ELIHPA and LIHPRHA denied them their contractual rights to prepay and their investment expectations. The result was a taking of "the unfettered right, on the part of the Owners, to opt to prepay the mortgage after 20 years from the date of final endorsement, exit the program and convert the project to its highest and best use." Plaintiffs refer to the prepayment provision as the "single most important contractual right held by each Owner." Defendant maintains that the prepayment right was contained in the notes between the owners and their private lending institutions and therefore not a property interest protected by the Fifth Amendment.

### A.

■ A taking claim requires that the plaintiff establish that it was the owner of property and that such property was taken by the United States for a public use. *Shanghai Power Co. v. United States*, 4 Cl. Ct. 237, 239–40 (1983), *aff'd* 765 F.2d 159 (Fed.Cir.), *cert. denied* 474 U.S. 909, 106 S.Ct. 279, 88 L.Ed.2d 243 (1985). The trial court in *Cienega I* concluded that plaintiffs had contracts with HUD that allowed prepayment after twenty years, and that these contractual rights with HUD were property interests protected by the Fifth Amendment:

> If, as applied, the prepayment restrictions compel any plaintiff to extend the regulatory agreement beyond the first 20 years of the mortgage (*i.e.*, longer than plaintiffs could have expected under the terms of their agreement with the government), then that plaintiff has been denied exclusive possession of his property because HUD has retained a substantial, controlling interest in the property, by virtue of the regulatory agreement.

*Cienega Gardens v. United States*, 33 Fed.Cl. 196, 213–14 (1995) (*Cienega I*). Plaintiffs

argue that this holding is undisturbed by the Federal Circuit's ruling in *Cienega II*, which concluded that the owners had no privity of contract with HUD regarding prepayment. *See Cienega II*, 194 F.3d 1231 (Fed.Cir.1998). In other words, even if they had no contract with HUD to allow prepayment, the Circuit did not rule out the possibility that they had a property right to prepay.

The Federal Circuit ruled that the transaction documents (the commitment to insure, the deed of trust note, the loan agreement, and the regulatory agreement) did not establish privity of contract between the owners and HUD with respect to a right to prepay. *Cienega II*, 194 F.3d at 1243. The Circuit recognized that the regulations allowed prepayment without HUD's approval after twenty years, but explained that those regulations were "expressly subject to amendment." *Id.* at 1244 (*construing* 24 C.F.R. §§ 221.749, 236.249 (1970)). HUD retained "the express power to amend the ... regulations at any time ..., subject only to the caveat that [lenders'] interests not be adversely affected." *Id.*

Although the trial court did conclude that plaintiffs had property rights in their agreements with HUD, the Circuit noted that HUD reserved the right to amend its regulations with regard to prepayment so long as the *lenders* were not harmed. Therefore, plaintiffs could not have had "unfettered" property interests in the prepayment provisions of their notes.

The existence of a valid property interest is the "bedrock requirement ... in all takings claims." *Wyatt v. United States*, 271 F.3d 1090, 1097 (Fed.Cir.2001). If plaintiffs did not have vested contract rights to terminate the affordability restrictions after twenty years, they cannot have had property interests in such rights. *See Wyatt*, 271 F.3d 1090.

### B.

Plaintiffs seem to argue that if they did not have property rights to prepay arising from HUD regulations that were in effect at the time they joined the program, they did have binding contracts with their lenders that EL-

IHPA and LIHPRHA affected. Plaintiffs' contracts with the lenders contained clauses that allowed prepayment without HUD approval after twenty years. They seek compensation for the consequences of the lenders' inability to perform their contractual obligation to allow plaintiffs to prepay their mortgages.

■ Valid contracts are property for Fifth Amendment purposes. *Lynch v. United States*, 292 U.S. 571, 579, 54 S.Ct. 840, 78 L.Ed. 1434 (1934). Not every exercise of governmental power that interferes with or frustrates performance of a contract constitutes a compensable taking, however. *Kearney & Trecker Corp. v. United States*, 231 Ct.Cl. 571, 688 F.2d 780, 783 (1982), *cert. denied*, 460 U.S. 1051, 103 S.Ct. 1498, 75 L.Ed.2d 929 (1983). This is particularly true when the contract is voluntarily entered into and in an area subject to pervasive government control. *Mitchell Arms v. United States*, 7 F.3d 212, 216 (Fed.Cir.1993). "The fact that legislation disregards or destroys existing contractual rights does not always transform the regulation into an illegal taking." *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 224, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986).

### 1. *Omnia*

■ The Government requisitioned a company's production of steel for the year and thereby coopted plaintiff's rights to purchase the same steel. The buyer's contract right to obtain the steel at favorable prices became impossible and unlawful because of government action. Plaintiff argued that this effected a taking of his property for the public good. The Supreme Court agreed that if the "contract in question was property within the meaning of the Fifth Amendment, and if taken for public use the government would be liable." *Omnia Commercial Co. v. United States*, 261 U.S. 502, 508, 43 S.Ct. 437, 67 L.Ed. 773 (1923). The Court noted, however, that "destruction of, or injury to, property is frequently accomplished without a 'taking' in the constitutional sense." *Id.* The Court reviewed prior case law on point and summarized: "The conclusion to be drawn from these and other cases which might be cited is, that for consequential loss or injury resulting from lawful governmental action, the law affords no remedy." *Id.* at 510, 43 S.Ct. 437.

If the lenders had accepted prepayment or the developers had ended affordability restrictions despite the change in HUD regulations, the Government's remedy would have been pursuant to statute, not contract. *See Id.* at 511, 43 S.Ct. 437. Today, the Government is no more a party to plaintiffs' contracts with the lenders than it was before the change in regulations. The borrowers and the lenders remain in place, with recourse only to the other under contract terms amended pursuant to HUD's reservation of rights.

Once the Federal Circuit the Government reserved its right to change the regulations that allowed plaintiffs to prepay. Plaintiffs had no vested right to prepay. The property right that plaintiffs claim was taken, the unconditional right to prepay, did not exist because HUD always reserved the power to restrict that right or to extinguish it. *See Cienega II*, 194 F.3d 1231 (Fed.Cir.1998).

### 2. *Bowen*

This result is supported by the Supreme Court's holding in *Bowen v. Public Agencies Opposed to Social Security Entrapment*, 477 U.S. 41, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986). The State of California and several of its public agencies and employees challenged the constitutionality of an amendment to the Social Security Act preventing states and agencies from withdrawing from the social security program. States had entered the social security system voluntarily pursuant to " § 418 agreements," which included the right of states to terminate their Agreements "[u]pon giving at least 2 years' advance notice in writing to [the Secretary]." 42 U.S.C. § 418(g)(1) (1982 ed., Supp. II).

Between 1977 and 1983, the number of state and local employees terminating their § 418 Agreements exceeded the number of new entrants. "After studying the trend towards termination of § 418 Agreements and the reasons for it, Congress determined that the increasing rate of withdrawals was threatening the integrity of the System in a

number of important respects." *Bowen,* 477 U.S. at 46–47, 106 S.Ct. 2390.

Congress amended § 418 in 1983 to prohibit withdrawal from the program. The amendment applied both to new withdrawals and to states that already had given written termination notices to withdraw. Two lawsuits were filed on behalf of the State of California and its public agencies and employees who had filed notices of withdrawal. The Supreme Court did not disturb a lower court ruling that § 418 Agreements were contracts, but it concluded that:

> [T]he provision simply was part of a regulatory program over which Congress retained authority to amend in the exercise of its power to provide for the general welfare....[T]he termination provision in California's § 418 Agreement did not rise to the level of "property." The provision simply cannot be viewed as conferring any sort of "vested right" in the face of precedent concerning the effect of Congress' reserved power on agreements entered into under a statute containing the language of reservation.

*Id.* at 55–56, 106 S.Ct. 2390.

■ Plaintiffs attempt to distinguish *Bowen* by arguing that their prepayment rights are parts of private contracts, not contracts with the Government. However, *Bowen* stands for the proposition that a contract right conditioned on a regulatory scheme that Congress expressly reserves its authority to amend is not a property right within the meaning of the Fifth Amendment. The Supreme Court stated that "contractual arrangements, *including* those to which a sovereign itself is party, 'remain subject to subsequent legislation' by the sovereign.' " *Bowen,* 477 U.S. at 52, 106 S.Ct. 2390 (quoting *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 147, 102 S.Ct. 894, 71 L.Ed.2d 21. (1982)) (emphasis added).

### C.

Plaintiffs have not established that they possessed a vested property right that could have been taken by the United States, so this cannot be a regulatory taking. The Federal Circuit has ruled that no physical taking of their property occurred. *Cienega Gardens v.*

*United States,* 265 F.3d 1237 (Fed.Cir.2001) (*Cienega III*). If plaintiffs had a contract right to prepay that could be viewed as a vested property right, they have not shown that the elements necessary to prove a regulatory taking are present.

■ The Supreme Court set out three criteria for determining whether a regulatory taking has occurred: (1) character of the governmental action, (2) economic impact of the regulation on the claimant, and (3) extent to which the regulation interfered with distinct investment-backed expectations. *See Loveladies Harbor v. United States,* 28 F.3d 1171, 1176–77 (Fed.Cir.1994) (citing *Penn Cent. Transp. Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978)).

### 1. Character of Government Action

■ The Supreme Court identified the following types of government action: (1) a physical invasion of real property; (2) a public program adjusting the benefits and burdens of economic life to promote the common good; (3) the promotion of health safety, morals or general welfare; and (4) the Government's acquisition of resources for uniquely public functions. *Penn Cent. Transp. Co. v. New York City,* 438 U.S. 104, 124–28, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).

■ Interference from a public program that adjusts the benefits and burdens of economic life to promote the common good normally is not a taking. *Penn Central,* 438 U.S. at 124, 98 S.Ct. 2646. "Where the purpose of a regulation which causes interference with property rights is to prevent injury to the public welfare as opposed to merely bestowing upon the public a nonessential benefit, compensation under the Fifth Amendment is not required." *Radioptics, Inc. v. United States,* 223 Ct.Cl. 594, 621 F.2d 1113, 1127 (1980).

"Congress routinely creates burdens for some that directly benefit others.... Given the propriety of the governmental power to regulate, it cannot be said that the Taking Clause is violated whenever legislation requires one person to use his or her assets for

the benefit of another." *Connolly,* 475 U.S. 211, 223, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986).

The goal of the National Housing Act is to provide a decent home and a suitable living environment for every American family. 42 U.S.C. § 1441(a). HUD's Section 221 Program was designed to assist private industry in providing housing for low and moderate income families and displaced persons. 12 U.S.C. § 1715*l* (d)(3). Section 236 was intended to reduce rentals for lower-income families by providing federal mortgage insurance and interest reduction payments to owners. 12 U.S.C. § 1715z–1(a). The Government action here is associated with a public program that "adjusts the benefits and burdens of economic life to promote the common good." *Penn Central,* 438 U.S. at 124, 98 S.Ct. 2646. This program is similar to the one in *Bowen,* where "Congress' decision that American workers need a federal program of social insurance protecting them in old age and disability 'has of necessity called forth a highly complicated and interrelated statutory structure.'" *Bowen,* 477 U.S. at 51, 106 S.Ct. 2390 (quoting *Flemming v. Nestor,* 363 U.S. 603, 610, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960)).

### 2. Economic Impact

■ The economic impact consideration of a regulation is "intended to ensure that not every restraint imposed by government to adjust the competing demands of private owners would result in a takings claim." *Loveladies Harbor,* 28 F.3d at 1176. *See also Pennsylvania Coal v. Mahon,* 260 U.S. 393, 413, 43 S.Ct. 158, 67 L.Ed. 322 (1922) ("Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law."). The focus of this factor is on the change in the fair market value of the subject property caused by the regulatory imposition. The court must "compare the value that has been taken from the property with the value that remains in the property." *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 497, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987).

Several Supreme Court decisions suggest that diminutions in value approaching 85 to 90 percent do not necessarily result in a regulatory taking. *See Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926) (no taking despite 75 percent diminution); *Hadacheck v. Sebastian,* 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915) (no taking despite 87.5 percent diminution). This court likewise has relied on diminutions in excess of 85 percent before finding a regulatory taking. *See Loveladies Harbor v. United States,* 21 Cl.Ct. 153, 160 (1990) (99 percent), *aff'd* 28 F.3d 1171 (Fed. Cir.1994); *Bowles v. United States,* 31 Fed. Cl. 37, 48–49 (1994) (92–100 percent); *Formanek v. United States,* 26 Cl.Ct. 332, 340 (1992) (88 percent).

Plaintiffs hoped to earn more by turning their low-income properties into properties charging fair market value. The change in regulation did not remove the property from their possession, however. They continued to operate low-income housing. They continued to receive the benefits of HUD's mortgage insurance and reductions in interest payments.[5]

### 3. Investment–Backed Expectations

■ The investment-backed expectations test is "a way of limiting takings recoveries to owners who [can] demonstrate that they bought their property in reliance on a state of affairs that did not include the challenged regulatory regime." *Loveladies Harbor,* 28 F.3d at 1177. "One who buys with knowledge of a restraint assumes the risk of economic loss." *Creppel v. United States,* 41 F.3d 627, 632 (Fed.Cir.1994) (citing *Concrete Pipe & Prods., Inc. v. Constr. Laborers Pension Trust for S. Cal.,* 508 U.S. 602, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993)).

---

**5.** "The enactment of the Housing Opportunity Program Extension Act of 1996 effectively repealed the prepayment restrictions imposed by LIHPRHA by permitting Section 221 program project owners to prepay their mortgage loans without HUD approval so long as the owners agreed not to raise rents for a period of 60 days following prepayment." *City Line v. United States,* 48 Fed.Cl. 837, 840 (2001) (citing Pub.L. No. 104–120, § 2, 110 Stat. 834 (relevant sections reprinted at 12 U.S.C. § 4101 (1996))). This law ended possible adverse effects from earlier regulations.

Plaintiffs joined a government program to provide low-income housing. They had knowledge of the Government's role in their chosen business venture. "Those who do business in [a] regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end." *Federal Housing Admin. v. Darlington, Inc.*, 358 U.S. 84, 91, 79 S.Ct. 141, 3 L.Ed.2d 132 (1958).

The Eighth Circuit rejected takings and due process challenges to ELIHPA in the Farmers Home loan context, holding:

> [T]he government may have acted unfairly in sharply curtailing, if not eliminating altogether, Parkridge's right to prepay .... However, we reject both due-process and takings challenges to this legislation. Parkridge was aware of the clear objectives of the program, and thus the risk of statutory change. The government, for its part, did not unmistakably waive its right to make such changes. Furthermore, we conclude no taking has occurred; even if one had, Parkridge has fallen far short of demonstrating that it will receive constitutionally insufficient compensation for its property ....

*Parkridge Investors Ltd. Partnership v. Farmers Home Admin.*, 13 F.3d 1192, 1198 (8th Cir.1994), *cert. denied*, 511 U.S. 1142, 114 S.Ct. 2163, 128 L.Ed.2d 886 (1994).

Plaintiffs could have anticipated that Congress might concern itself with the possibility of a low-income housing shortage and act to prevent or delay such a shortage. They could have insisted on contract language that would have shifted the risk of later congressional action to the Government. Plaintiffs understood the goals of this federal housing program and benefitted from them. If they did not obtain as much benefit as they wanted, that is not a basis for a taking under the Fifth Amendment in this court.

### III. CONCLUSION

The Federal Circuit has ruled that plaintiffs could not enforce the right to prepay against the Government because they had no privity of contract. They could not have enforced it against the lenders either, because Congress passed laws making that im-

possible or illegal. Thus, plaintiffs did not have a vested right to prepay.

Plaintiffs' rights and obligations occurred in consequence of a regulatory scheme that Congress established and reserved at all times the right to amend. No vested property rights exist in such circumstances. Having had no enforceable rights to prepay, plaintiffs cannot sue the United States for taking such rights.

■ The *Penn Central* analysis does not support a regulatory taking. Government action involved a public program with a comprehensive regulatory scheme designed to promote the common good. Plaintiffs do not explain in their complaint or in their briefs how they were harmed monetarily, but any economic impact could not be more than mere diminution in value. Plaintiffs knew that they were entering a sensitive and highly regulated field that was subject to continuing congressional interest and attention.

Defendant's Motion for Summary Judgment is GRANTED. The Clerk will enter judgment for defendant. No costs.