**CITY LINE JOINT VENTURE, Plaintiff,**

**v.**

**The UNITED STATES, Defendant.**

**No. 96–738C.**

United States Court of Federal Claims.

May 26, 2006.

was entitled to contract damages as a result of the enactment of legislation abridging its right to prepay a privately transacted, federally insured mortgage issued pursuant to section 221(d)(3) of the National Housing Act of 1954, Pub.L. No. 83–560, 68 Stat. 590, 599–601 (codified as amended at 12 U.S.C. § 1715*l* (d)(3) (2000)) ("section 221 program"). *City Line Joint Venture v. United States,* 48 Fed.Cl. 837 (2001). Specifically, the court ruled that the statutes in question—the Emergency Low Income Housing Preservation Act of 1987 ("ELIHPA") and the Low–Income Housing Preservation and Resident Homeownership Act of 1990 ("LIHPRHA")—were not primarily aimed at contracts involving the government as a party, but were instead public and general in their reach and therefore constituted sovereign acts. Accordingly, the court held that the government was excused from any contract obligation to honor plaintiff's prepayment right since ELIHPA and LIHPRHA rendered that performance impossible. *Id.* at 841–42.

We now face the question of whether the restrictions on mortgage prepayment imposed by ELIHPA and LIHPRHA constitute a taking of property for which compensation is owed under the Fifth Amendment to the United States Constitution. The court heard evidence on this issue at a trial held from July 25 through August 2, 2005. On the basis of that evidence and the parties' post-trial briefs, we conclude that no regulatory taking resulted from the government's action.

Gerson B. Kramer, Silver Spring, Maryland, attorney of record for plaintiff.

Sean M. Dunn, Kenneth D. Woodrow, and Christina C. Ashworth, with whom were Assistant Attorney General Peter D. Keisler, Director David M. Cohen, and Assistant Director Brian M. Simkin, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, for defendant.

## OPINION

WIESE, Judge.

In an earlier phase of this litigation, the court rejected plaintiff's contention that it

## FACTS

### A.

Section 221 of the National Housing Act was enacted in 1954 to encourage the construction of moderate– and low-income housing by offering property owners federally subsidized, low-interest loans as well as special tax incentives. As a prerequisite to participating in the program, a property owner was required to enter into a regulatory agreement with the Department of Housing and Urban Development ("HUD") that enumerated the terms and conditions under

which the owner was to operate the property, including, *inter alia,* limitations on tenant income levels, rental rates, and the rate of return an owner could receive from the project. Although by its terms the regulatory agreement was to remain in effect until the mortgage loan was repaid, HUD regulations permitted prepayment without the agency's approval after a period of 20 years.

In the late 1980s, however, Congress became concerned that many property owners participating in the section 221 program would elect to exercise their mortgage prepayment rights at the end of the 20–year period, thereby removing those properties from HUD's regulatory control and correspondingly diminishing the pool of available moderate– and low-income rental housing. To address this concern, Congress enacted ELIHPA, Pub.L. No. 100–242, tit. II, 101 Stat. 1877 (1988) (relevant sections reprinted at 12 U.S.C. § 1715*l* note (2000)), on February 5, 1988, a temporary measure requiring a property owner who sought to prepay a mortgage insured or held by HUD to file a "notice of intent" to prepay followed by a "plan of action" describing, *inter alia,* the effect of any proposed changes on existing tenants. §§ 222, 223, 12 U.S.C. § 1715*l* note. Pursuant to that statute, HUD was authorized to approve a plan of action only after it had made written findings that implementation of the plan would not adversely affect current tenants or materially "affect the availability of decent, safe, and sanitary housing" to low-income tenants residing within the housing market served by the owner's project. § 225(a), 12 U.S.C. § 1715*l* note. ELIHPA additionally offered property owners a range of economic incentives designed to increase the rates of return on their investments in order to encourage continued participation in the section 221 program. § 224(b), 12 U.S.C. § 1715*l* note.

Two years after the passage of ELIHPA, Congress enacted LIHPRHA, Pub.L. No. 101–625, tit. VI, 104 Stat. 4249 (1990) (codified in scattered sections of Title 12 of the United States Code, including 12 U.S.C. §§ 4101–4124 (2000)), a more permanent measure designed to address the projected shortfalls in low-income housing. Like its predecessor, LIHPRHA conditioned a property owner's exercise of its prepayment right on findings by HUD that termination of affordability restrictions through prepayment of the mortgage would not "materially increase economic hardship" on existing tenants by increasing rental payments by more than 10 percent, by involuntarily displacing such tenants, or by decreasing the ready availability of "decent, safe, and sanitary [low-income] housing." 12 U.S.C. § 4108(a). Similarly, LIHPRHA, like ELIHPA, authorized HUD to offer financial incentives to property owners in exchange for an owner's agreement to forego prepayment in favor of extending the affordability restrictions and remaining in the program. 12 U.S.C. § 4109(b). Such incentives included increased access to residual receipts accounts, rent increases, financing for capital improvements, and access to a portion of the property owner's equity. *Id.*

LIHPRHA additionally contained a provision, initiated at a property owner's request, that authorized HUD to approve the sale of a property at its appraised fair market value (measured without HUD restrictions) to a purchaser who would agree to maintain the property's low-income affordability restrictions. 12 U.S.C. §§ 4110(a), 4121(a), (b). LIHPRHA also contemplated HUD-provided financial assistance to qualifying purchasers to facilitate the sale of the property. 12 U.S.C. § 4110(d). Finally, in the event that the property could not be sold to a qualifying purchaser, LIHPRHA permitted the property owner to terminate the low-income affordability restrictions through prepayment of the mortgage. 12 U.S.C. § 4114(a)(2).

On March 28, 1996, Congress enacted the Housing Opportunity Program Extension Act of 1996, Pub.L. No. 104–120, 110 Stat. 834 (1996) ("HOPE"), ending the restrictions imposed by ELIHPA and LIHPRHA by allowing a property owner to prepay a mortgage without prior HUD approval so long as the owner agreed not to raise rents for 60 days following the prepayment. It is this statutory framework that remains in place today.

**B.**

During the period relevant to this lawsuit (1991–1997), plaintiff, a Maryland partner-

ship, owned and operated a 283–unit rental housing project known as the Prestridge located in Suitland, Maryland. The Prestridge was constructed in 1968 with the aid of below-market mortgage financing provided by Riggs National Bank of Washington, DC ("Riggs Bank") pursuant to the section 221 program.

Although the regulatory agreement plaintiff entered into under section 221 was silent about a property owner's right to prepay its mortgage, the secured note that plaintiff executed in favor of Riggs Bank at the initial closing of the loan for the Prestridge explicitly affirmed the owner's prepayment right as follows: "The debt evidenced by this note may not be prepaid either in whole or in part prior to 20 years from the date of final endorsement of this note by the Federal Housing Commissioner without the prior written approval of the Commissioner; thereafter, the debt evidenced by this note may be prepaid either in whole or in part without the approval of the Commissioner."

On August 30, 1971, HUD provided the final endorsement of the note, allowing Riggs Bank to sell and assign the loan to the Government National Mortgage Association, a mortgage financing agency popularly known as Ginnie Mae. In 1977, however, plaintiff defaulted on its mortgage note, causing Ginnie Mae to apply to HUD for insurance benefits and to reassign its interest in the note to that agency. HUD remained the holder of plaintiff's mortgage note for the duration of its term.

Contemporaneous with its default and in an effort to avoid foreclosure on its property, plaintiff approached Brunswick Management Company, a successful property management proprietorship, about joining the project as an investor. Brunswick subsequently acquired a 49 percent interest in the project and took over the functions of managing partner, ultimately returning the Prestridge to financial stability.

It was under this new, successful management that plaintiff first filed its notice of intent to prepay its mortgage with HUD on December 19, 1990. Under the heading "Plans for the Project," plaintiff announced its intention to "plan a sale [of the Pres-

tridge] to an independent party for the highest and best use." Consistent with this goal, plaintiff hired Recapitalization Advisors, Inc., a consulting firm with expertise in the financing and management of properties participating in government-assisted housing programs, to evaluate the Prestridge's maximum market value under LIHPRHA—otherwise referred to as the property's "preservation value." 12 U.S.C. § 4103(b). Assuming conversion of the Prestridge to condominiums over a three-year period and its sale to a qualifying purchaser under LIHPRHA, Recapitalization Advisors determined that the property had a "probable Net Preservation Equity ... of $7,448,600 ... over and above the HUD mortgage of $2,846,046."

Approximately a year after its receipt of the Recapitalization Advisors report, plaintiff commissioned Mr. Robert D. Wright, an appraiser and property consultant, to undertake a second appraisal of the Prestridge with a view toward developing a course of action based on the options offered under LIHPRHA. Mr. Wright determined that the property's highest and best use involved its conversion to a market-rate rental project and concluded, valued on that basis, that the Prestridge had a preservation value of $8.2 million. Mr. Wright further determined that conversion of the property to condominiums (the course of action contemplated by Recapitalization Advisors) "would not be the maximally productive use" of the property and would in fact reduce its "as is" value to an estimated $6,720,000.

Although informed by both Recapitalization Advisors and Mr. Wright of the various options available to it under ELIHPA and LIHPRHA, plaintiff took no action under either statute. Indeed, even when advised in March 1996 that Congress had restored a property owner's right to prepay without prior HUD approval (i.e., through the enactment of HOPE), plaintiff did not resubmit its notice of intent to prepay its mortgage until June 15, 1996. Following that submission, however, plaintiff began to take the steps necessary to obtain a market-rate loan with which to pay off the existing HUD-insured loan, including, inter alia, seeking an independent appraisal of the Prestridge by Mr.

Dean G. Gutridge, who valued the property as of March 20, 1997, at $8.9 million.

Plaintiff prepaid its HUD-insured mortgage in August 1997. Thereafter, plaintiff operated the Prestridge as a market-rate rental property until 2001, at which time it sold the property to private investors for $10 million. Plaintiff now seeks $2,144,931 as compensation for the taking of its property between August 1991 and August 1997, resulting from its inability to prepay its mortgage during that period.

## DISCUSSION

Defendant offers two primary challenges to plaintiff's claim for compensation. First, defendant argues that plaintiff's claim is not ripe for adjudication because the impact of ELIHPA and LIHPRHA on plaintiff is unknown. Second, defendant maintains that even if the claim were ripe, plaintiff has failed to demonstrate a compensable injury under the standards set forth in *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), to establish a regulatory taking. We discuss these arguments in turn below.

### A. *Ripeness of Plaintiff's Claim*

 The term "ripeness" refers to the law's requirement that an injury complained of must be real, concrete, and manifest. "Courts may not decide cases that 'involve[ ] uncertain and contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Valeria G. v. Wilson*, 12 F.Supp.2d 1007, 1016 (N.D.Cal.1998) (quoting *Metzenbaum v. Federal Energy Regulatory Comm'n*, 675 F.2d 1282, 1289 (D.C.Cir.1982)). It is thus premature to assert a taking of property on the basis of a statute or regulation whose actual effect remains to be determined by those charged with its administration. "[O]nly a regulation that 'goes too far' ... results in a taking under the Fifth Amendment ...," *Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 734, 117 S.Ct. 1659, 137 L.Ed.2d 980 (1997) (citation omitted), and "[a] court cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes," *MacDonald Sommer & Frates v. Yolo County*,

477 U.S. 340, 348, 106 S.Ct. 2561, 91 L.Ed.2d 285 (1986).

 In defendant's view, it is this uncertainty as to the impact of ELIHPA and LIHPRHA on plaintiff that renders plaintiff's claim premature. Because plaintiff never attempted to prepay its mortgage during the years ELIHPA and LIHPRHA remained in force, defendant argues that the effect of those provisions on the exercise of plaintiff's prepayment right is uncertain. Indeed, defendant notes that prepayment might in fact have been permitted. In addition, defendant maintains that plaintiff's failure to seek compensation through a market-rate sale prevents the court from determining whether ELIHPA and LIHPRHA imposed upon plaintiff any burden for which compensation under the Fifth Amendment could now legitimately be claimed. In the absence, then, of an effort by plaintiff either to prepay its mortgage or to sell its property, defendant maintains that plaintiff's claim should be dismissed as unripe.

We do not agree, however, that plaintiff's inaction as to either point compromises the ripeness of its claim. With regard to defendant's first argument, the evidence makes clear that HUD could not have made the factual findings necessary to allow plaintiff to prepay its mortgage, thereby foreclosing the possibility of prepayment as a matter of law. *Cienega Gardens v. United States*, 265 F.3d 1237, 1246 (Fed.Cir.2001) ("[S]ection 4108 [of LIHPRHA] sets forth strict numerical criteria that must be met before HUD may exercise any discretion it has to approve prepayment requests."). Plaintiff was thus excused from seeking prepayment as a condition to establishing the ripeness of its claim since such an undertaking would have been futile. *Id.* at 1248 (recognizing that "a claim could be ripe absent a prior, final decision from HUD 'in the limited circumstance in which the administrative entity has no discretion regarding the regulation's applicability and its only option is enforcement'") (citation omitted).

We base our conclusion regarding the futility of plaintiff's seeking to prepay its mortgage on the testimony of two witnesses. First, plaintiff's appraisal expert, Mr. Dean

G. Gutridge, testified that then-prevailing market rates in Prince George's County, Maryland (the county in which the Prestridge is located) exceeded rental rates at the Prestridge by 22.5 to 29.4 percent, thus making it impossible for plaintiff to charge market rates without violating LIHPRHA's requirement that prepayment not "materially increase economic hardship for current tenants" or effect rent increases for tenants in excess of 10 percent.[1] Second, plaintiff's primary fact witness, Mr. Alfred A. Shamah, the managing partner of City Line Joint Venture and an individual with in-depth knowledge of the low-income rental housing market in Prince George's County, provided unchallenged testimony that the removal of the Prestridge from the section 221 program would adversely affect the availability of decent, safe, and sanitary housing in contravention of LIHPRHA's second principal requirement because "there was virtually . . . none [of such housing] available." HUD would thus have been unable on the facts to give plaintiff its approval for withdrawing from the section 221 program and plaintiff was accordingly exempted from seeking it.

Defendant's second contention—that plaintiff's claim is unripe because plaintiff failed to pursue the sale option under section 4110(a) of LIHPRHA—is similarly unavailing.[2] Contrary to defendant's characterization of section 4110, we do not view that provision as a mechanism for the payment of just compensation for the taking of the unconditional right to prepayment. Rather, we see that section as an opportunity for a property owner to sell a property at its fair market value in lieu of sustaining the ongoing loss of market rents resulting from the restriction on prepayment. Although from an economic standpoint the fair market value of a property and the rents receivable from a property may be linked concepts (the fair market value of a property is determined on the basis of its projected future rents), the taking asserted here is not the fee simple interest in the property but rather the contractual right to prepayment and the interest

---

1. Section 4108(a) of LIHPRHA, which is virtually identical to section 225(a) of ELIHPA, sets forth the requirements for mortgage prepayment as follows:

The Secretary may approve a plan of action that provides for termination of the low-income affordability restrictions through prepayment of the mortgage or voluntary termination of the mortgage insurance contract only upon a written finding that—

(1) implementation of the plan of action will not—

(A) materially increase economic hardship for current tenants, and will not in any event result in (i) a monthly rental payment by any current tenant that exceeds 30 percent of the monthly adjusted income of the tenant or an increase in the monthly rental payment in any year that exceeds 10 percent (whichever is lower), or (ii) in the case of a current tenant who already pays more than such percentage, an increase in the monthly rental payment in any year that exceeds the increase in the Consumer Price Index or 10 percent (whichever is lower); or

(B) involuntarily displace current tenants (except for good cause) where comparable and affordable housing is not readily available determined without regard to the availability of Federal housing assistance that would address any such hardship or involuntary displacement; and

(2) the supply of vacant, comparable housing is sufficient to ensure that such prepayment will not materially affect—

(A) the availability of decent, safe, and sanitary housing affordable to low-income and very low-income families or persons in the area that the housing could reasonably be expected to serve;

(B) the ability of low-income and very low-income families or persons to find affordable, decent, safe, and sanitary housing near employment opportunities; or

(C) the housing opportunities of minorities in the community within which the housing is located.

2. In support of its argument, defendant relies on *Williamson County Regional Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985), in which the Supreme Court ruled that a landowner's takings claim against a local government was premature in part because the landowner had not pursued the compensation remedies provided under state law. The Court explained: "The Fifth Amendment does not proscribe the taking of property; it proscribes taking without just compensation. . . . [Therefore, if] the government has provided an adequate process for obtaining compensation, and if resort to that process 'yield[s] just compensation,' then the property owner 'has no claim against the Government' for a taking." *Id.* at 194–95, 105 S.Ct. 3108 (quoting *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1013, 1018, 104 S.Ct. 2862, 81 L.Ed.2d 815 n. 21 (1984)).

in real property that right protected. Accordingly, plaintiff was not required to offer its property for sale in order to receive compensation for the embedded value of the market rents that the restriction on prepayment had rendered inaccessible.

In addition, the fact that section 4110 provides no assurance that a property offered for sale will in fact be sold further prevents us from characterizing that section as a compensation provision. Such a sale could fail, for example, if no qualified purchasers were found within a 15–month period or if a qualified purchaser were ultimately unable to proceed with the transaction. 12 U.S.C. § 4114(a)(2). Additionally, sales involving federal assistance were "[s]ubject to the availability of amounts approved in appropriation Acts." 12 U.S.C. § 4111(d)(1). Given the limitations of section 4110 and the uncertainty of payment they suggest, we are unable to construe that provision as a mechanism for the payment of just compensation. We thus conclude that plaintiff's failure to resort to the sale provision of section 4110 does not render its claim unripe.

### B. Establishing a Regulatory Taking

■ Having established the ripeness of plaintiff's claim, we now turn to the question of whether the statutory restrictions on plaintiff's right to prepayment constitute a taking of property for which just compensation must be paid under the Fifth Amendment. In *Penn Central*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631, the Supreme Court identified three factors as determinative of a regulatory taking: (i) the character of the government's action; (ii) the reasonableness of the investment-backed expectations underlying the property interest at issue; and (iii) the economic impact of the government's action. The case law instructs that in the application of this test, no single factor is to be regarded as dispositive in its own right. *Palazzolo v. Rhode Island*, 533 U.S. 606, 634–36, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001) (O'Connor, J., concurring). Rather, we must consider their content as a whole—the totality of the facts they bring to light—in determining whether the burdens imposed by the government's action "are functionally comparable to government ap-

propriation or invasion of private property," *Lingle v. Chevron USA Inc.*, 544 U.S. 528, 529, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005), and therefore, "in all fairness and justice, should be borne by the public as a whole," *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960).

#### 1. The Character of the Government's Action

In *Cienega Gardens v. United States*, 331 F.3d 1319, 1337–40 (Fed.Cir.2003) (hereinafter "*Cienega VIII*"), the Federal Circuit explained that examination of the character of the government's action requires an inquiry into the purpose and importance of the public interest at stake as well as the burdens that action imposes on the individual claimant in contrast to the public as a whole. Consistent with these considerations, the property owners in *Cienega VIII* argued that ELIHPA and LIHPRHA had the character of a taking because those statutes authorized the continued occupation of their properties to address a societal shortage of low-income housing and thus intruded upon their ownership rights "beyond the level of traditional governmental limits on land titles." *Id.* at 1338. More specifically, the property owners claimed that in compelling them to continue to rent their properties at below-market rates to government-approved, low-income tenants, ELIHPA and LIHPRHA eviscerated their right to exclude—a right identified in *Kaiser Aetna v. United States*, 444 U.S. 164, 176, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979), as "one of the most essential sticks in the bundle of rights that are commonly characterized as property." Additionally, the property owners argued that the enactment of ELIHPA and LIHPRHA amounted to a taking because those statutes restricted their right to sell or lease their properties to parties not participating in the housing program. Such a restriction, the property owners maintained, is akin to the statute abrogating the common law right to devise property to one's heirs that was held to constitute a taking in *Hodel v. Irving*, 481 U.S. 704, 715–16, 107 S.Ct. 2076, 95 L.Ed.2d 668 (1987).

The Federal Circuit accepted the *Cienega VIII* plaintiffs' arguments, concluding that

Congress "[u]nquestionably ... acted for a public purpose (to benefit a certain group of people in need of low-cost housing)" and that "just as clearly, the expense was placed disproportionately on a few private property owners." *Cienega VIII*, 331 F.3d at 1338. The court went on to explain:

> Congress' objective in passing ELIHPA and LIHPRHA—preserving low-income housing—and method—forcing some owners to keep accepting below-market rents—is the kind of expense-shifting to a few persons that amounts to a taking. This is especially clear where, as here, the alternative was for all taxpayers to shoulder the burden. Congress could simply have appropriated more money for mortgage insurance and thereby induced more developers to build low-rent apartments in the public housing program to replace housing, such as the plaintiffs', that was no longer part of the program.

*Id.* at 1338–39 (footnote omitted). The Federal Circuit thus held as a matter of law "that the government's actions in enacting ELIHPA and LIHPRHA, insofar as they abrogated the Model Plaintiffs' contractual rights to prepay their mortgages and thereby exit the housing programs, had a character that supports a holding of a compensable taking." *Id.* at 1340.

Despite the Federal Circuit's pronouncement in *Cienega VIII*, however, defendant argues that that court's findings do not govern the instant suit. That is the case, defendant maintains, because the *Cienega VIII* court confined the application of its ruling to the so-called "model" plaintiffs—the four claimants whose cases had initially been tried under a contract theory of liability and damages—for whom the court found the existing trial record to be factually sufficient to support the determination of a compensable taking. The court remanded the remaining cases, however, noting that it was unable on the facts then before it to complete a *Penn Central* analysis: "[B]ecause the record before us is not developed at all as to, for example, economic impact, we remand for the trial court to allow the parties to develop an appropriate record and to rule on liability, and if liability is found, also on damages."

*Id.* at 1354. Defendant insists that City Line is in the same position as the non-model plaintiffs in *Cienega VIII*, and therefore that no part of the *Cienega VIII* decision can have any application to the instant case. According to defendant, then, this court is free to decide for itself whether abridgement of the right to prepayment is a government action having the character of a taking.

We cannot accept this argument. The Federal Circuit's determination in *Cienega VIII* regarding the character of the government's action as manifested in ELIHPA and LIHPRHA was not a determination involving facts unique to the parties then before it or facts that might vary from case to case. Rather, that determination was based on facts of universal application to cases of the instant sort, specifically, facts identifying Congress's purpose in enacting ELIHPA and LIHPRHA and facts identifying the class of individuals on whom the burden of those enactments fell—property owners who had participated in the section 221 program. Such facts are properly regarded as legislative facts, *i.e.*, facts that are universally recognized or not seriously in dispute. *United States v. Gould*, 536 F.2d 216, 220 (8th Cir. 1976) (defining legislative facts as "established truths, facts or pronouncements that do not change from case to case but apply universally"). The Federal Circuit's identification of such facts as the basis for its ruling, together with that court's legal conclusion regarding the character of the government's action they reveal, are not open to reexamination by this court. *Landell v. Sorrell*, 382 F.3d 91, 203 (2nd Cir.2004) (Winter, J., dissenting) ("Legislative facts ... govern all future cases implicating the particular rule of law or its application and are not subject to future challenge by a litigant save by an attempt to have the rule of law overruled."). Accordingly, the Federal Circuit's determination in *Cienega VIII* that the enactment of ELIHPA and LIHPRHA had the character of a compensable taking applies here as well.

### 2. *Reasonableness of Plaintiff's Investment–Backed Expectations*

The second consideration in the regulatory takings analysis is the reasonableness of the

investment-backed expectations underlying the property interest at issue. As explained by the Federal Circuit, the expectations inquiry serves as "a way of limiting takings recoveries to owners who could demonstrate that they bought their property in reliance on a state of affairs that did not include the challenged regulatory regime." *Loveladies Harbor, Inc. v. United States,* 28 F.3d 1171, 1177 (Fed.Cir.1994). Plaintiff must therefore prove both that it "actually believed in a certain outcome and entered the [section 221] program in reliance on [that outcome]," *Cienega VIII,* 331 F.3d at 1346, and that a reasonable investor in plaintiff's circumstances would "believe that the twentieth-year prepayment right was guaranteed by the regulations and that HUD 'authorized' and endorsed mortgage contracts expressly including it," *id.* at 1348 (footnote omitted).

The present dispute centers on the first of these inquiries—plaintiff's expectation regarding its right to prepay.[3] Defendant maintains that plaintiff's reliance on its prepayment right must be determined at the time it entered into the contract but that no evidence exists of such reliance by the original investors. Defendant notes that the only testimony regarding the importance of the prepayment right came from plaintiff's managing partner, Mr. Shamah, an individual who did not invest in the Prestridge until 1977, some nine years after the project was first conceived and six years after HUD's final endorsement of the property's mortgage.[4] In defendant's view, such testimony is thus irrelevant to the question of whether the original investors relied on the prepayment right in entering the section 221 program and therefore adds nothing to the takings analysis.

While defendant is correct that reliance should be measured at "[t]he point in time when ... the complaining party entered into the activity that triggered the obligation, ... specifically when the [property owners] en-

tered the programs," *Chancellor Manor v. United States,* 331 F.3d 891, 904 (2003), we read this language as a more particularized phrasing of the broader rule that in assessing the reasonableness of investment-backed expectations, courts should look to the regulatory regime in place at the time the property interest is acquired by the claimant rather than to the regime that may have shaped the prior owner's expectations, *Commonwealth Edison Co. v. United States,* 271 F.3d 1327, 1350 (Fed.Cir.2001); *Forest Properties, Inc. v. United States,* 39 Fed.Cl. 56, 77 (1997), *aff'd,* 177 F.3d 1360, 1366–67 (Fed.Cir.1999). Similarly, where a property interest is created by contract, we do not believe the expectations inquiry is confined to the original contracting parties, but rather should include an examination of the reasonableness of the expectation of subsequent investors. We therefore conclude that Mr. Shamah's testimony identifying the contract right to prepayment as "key" to his decision to acquire a 49 percent interest in the Prestridge is sufficient to establish plaintiff's investment-backed expectations.

Nor do we accept defendant's argument that where plaintiff's "primary" focus in making its investment—described by defendant as the tax benefits of accelerated depreciation, property management fees, the build-up of equity, and a six percent cash dividend—is realized, no taking can be found. Although from an investment standpoint the right to prepayment may not have been the primary motivation for plaintiff's decision to construct and operate the Prestridge, that right was not without economic significance. As discussed below, the economic impact occasioned by the loss of that right, though not of a magnitude sufficient to render operation of the Prestridge unprofitable, was nevertheless of consequence. Indeed, even by defendant's reckoning, loss of the prepayment right diminished the value of the Prestridge by 8.45 percent. We thus conclude that the right to

---

**3.** As to whether it was reasonable for plaintiff to have had such an expectation, defendant offers no evidence to suggest that a reasonable investor should have anticipated a change in law abrogating a contract-based right. Absent such evidence, the expectation that a contract term will be honored is reasonable per se.

**4.** Mr. Shamah identified the existence of the prepayment right as critical to his decision to acquire an ownership interest in the Prestridge, testifying that he "would not have touched [the investment] if there was not a date certain at which I could make my own decisions."

prepayment was an important supporting element in plaintiff's investment decision and the expectation of its fulfillment had a reasonable basis in fact. *See Cienega VIII*, 331 F.3d at 1349–50 (describing the prepayment term as "presumptively material" because it was a "significant factor in the calculation of the total profit that could be expected over the lifetime of the investment in the property").

### 3. *The Economic Impact of the Government's Action*

The final factor in assessing plaintiff's claim of a compensable taking is the economic impact of the government's action. To trigger the constitutional mandate of just compensation, the burden imposed by the government action must be substantial. "What has evolved in the case law is a threshold requirement that plaintiffs show 'serious financial loss' from the regulatory imposition in order to merit compensation." *Id.* at 1340 (quoting *Loveladies Harbor*, 28 F.3d at 1177). The insistence upon "serious financial loss" as a predicate to the finding of a compensable taking is an acknowledgment of the reality that the "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 413, 43 S.Ct. 158, 67 L.Ed. 322 (1922). Defendant insists that plaintiff's case falls far short of demonstrating the requisite degree of harm.

In support of its argument, defendant begins with the economic benefits available to plaintiff under ELIHPA and LIHPRHA, specifically the opportunity to sell the Prestridge at its appraised market price as measured by the property's highest and best use (or failing such a sale, to prepay the mortgage). 12 U.S.C. §§ 4110, 4114. An exercise of the sale option, defendant argues, would have obviated any economic impact caused by the restriction on prepayment. Defendant thus maintains that plaintiff has failed to prove economic harm.

What defendant's argument ignores, however, is that the sale option provided in section 4110 does not constitute a new right given in exchange for or in mitigation of the right taken, but is instead a right of ownership that plaintiff had possessed even before the enactment of ELIHPA and LIHPRHA. Those statutes, in other words, offered plaintiff no benefit it could not have realized on its own; hence, we fail to see how the alleged incentive can be regarded as a counterweight to the extinguishment of the right to prepayment. Simply put, ELIHPA and LIHPRHA took away the right to prepay and gave nothing new in return. The sale option, therefore, cannot properly be considered a factor in the substantive takings analysis. Thus, the only question is whether the loss of the right to prepay, considered without regard to the statutory options, had an economic impact sufficient to constitute a taking.

In assessing the economic impact of the government's action, plaintiff argues in favor of a "lost revenue" model, *i.e.*, a model that contrasts the rents plaintiff actually earned between August 1991 and August 1997 with the rents it could have received in the absence of HUD restrictions. Plaintiff identifies this amount as $1,786,854, a figure which, when adjusted for risk and the time value of money, comes to $2,144,931. In the alternative, plaintiff measures its economic loss by comparing its actual return on equity—an amount it calculates as .086 percent—with the amount it could have earned in an alternate investment (*e.g.*, Treasury bonds), resulting in a 99 percent decrease in plaintiff's rate of return. Plaintiff maintains that either of these figures—the $2,144,931 in lost rental income or the 99 percent decrease in plaintiff's return on equity—demonstrates the severity of the economic impact it suffered and suffices to support a compensable takings claim.

In contrast to plaintiff's income-based method for assessing economic impact, defendant argues in favor of a value-based approach, assessing the economic impact by comparing the value of the Prestridge before the right to prepay was terminated with its value following restoration of that right. Using this "diminution in value" analysis, defendant's appraisal expert, Mr. Oakleigh J. Thorne, determined that the loss of the prepayment right and the consequent denial of

access to the private rental market resulted in a $600,000 decrease in the Prestridge's market value, or an 8.45 percent decline from its pre-ELIHPA value.[5] Such a diminution in value, defendant argues, is not of an economic magnitude sufficient to support a regulatory taking.

While defendant is correct that we must consider the value of the property as a whole in assessing the statutes' economic impact, *see, e.g., Concrete Pipe and Prod. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.,* 508 U.S. 602, 644, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993); *Penn Central,* 438 U.S. at 130–31, 98 S.Ct. 2646, we cannot accept defendant's assertion that the methods on which plaintiff relies are analytically inadequate for that purpose. To the contrary, the same approach plaintiff employs—the revenue lost and its resulting diminished return on equity—was adopted by the Federal Circuit in *Cienega VIII,* 331 F.3d at 1341–43, to support a determination of "serious financial loss" owing to the termination of the prepayment right. Similarly, in *Chancellor Manor,* 331 F.3d at 905, a companion case decided the same day, the court of appeals instructed the trial court to assess economic impact by calculating "the rate of return on invested capital under the new statutes as implemented by HUD and the reasonableness of that return." In light of these determinations by the Federal Circuit, defendant's argument that economic impact should be examined solely through the lens of the diminution in value approach is rendered moot—*Cienega VIII* and *Chancellor Manor* clearly dictate otherwise.

a. *Adjustments to Plaintiff's Lost Revenue Model*

Our willingness to accept plaintiff's general approach, however, does not mean that we are able to endorse all of its specific calculations. As an initial matter, we note that plaintiff's methodology ignores conversion costs, *i.e.,* costs associated with upgrades to the Prestridge's common areas and individual rental units, despite evidence that plaintiff would have had to incur such costs in order to compete effectively in the broader rental market and thereby realize market rates. Plaintiff's own appraiser, Mr. Wright, noted in his 1994 appraisal that the Prestridge "would require upgrades to its common areas and unit interiors" in the amount of $1,188,536 in order "[t]o be competitive as an un-subsidized rental project in this market." Defendant's appraisal expert, Mr. Thorne, similarly estimated necessary upgrade expenses of $1,372,550 in order for the Prestridge to command market rentals. Indeed, plaintiff undertook such renovations as reflected in Mr. Gutridge's 1997 appraisal: the Prestridge "has experienced an ongoing renovation and maintenance program over the past several years [and] as such, no adjustment [in appraisal price] for physical condition is required."

Based on both the need for upgrades identified in the various appraisals and the fact that such improvements were actually undertaken, we conclude that the Prestridge's conversion to market-based rentals in 1991 (the premise underlying plaintiff's lost revenue model) could not have been successfully carried out absent an upgrade to its common areas and individual units. It follows, then, that the $1.79 million loss in market rental income identified by plaintiff must be reduced by the capital expenditures necessary to convert the Prestridge to an apartment complex capable of earning the competitive market rentals plaintiff's lost revenue model assumes. As noted above, such costs were estimated at $1.19 million by plaintiff's ap-

5. Using both a sales comparison approach and an income approach, Mr. Thorne calculated that, net of adjustments for conversion costs (*i.e.,* the cost of property upgrades required to meet competitive market rental standards), the Prestridge had a fair market value of $7.1 million in 1991 (the date prepayment could have taken place had ELIHPA and LIHPRHA not been enacted) and a fair market value of $7.8 million in 1996 (the date the right to prepay was restored through the enactment of HOPE). Mr. Thorne in turn adjust-

ed the 1996 value ($7.8 million) to reflect 1991 dollars and to account for the rental income received between 1991 and 1996, leading to an adjusted value of $6.5 million. By comparing the difference in 1991 market values—$7.1 million if prepayment had occurred in 1991 and $6.5 million if prepayment were postponed until 1996—Mr. Thorne thus identified an 8.45 percent decline in the Prestridge's value resulting from the enactment of ELIHPA and LIHPRHA ((7,100,000—6,500,00) ÷ 7,100,000 = 8.45%).

praiser in 1994 and $1.37 million by defendant's expert at trial. From the average of these amounts, we derive a final figure of $768,032, representing the amount of conversion costs allocable to the six-year period for which plaintiff calculated lost revenue. (In the absence of any specific evidence on the point, we have assumed in the overall the amortization of conversion costs over a ten-year period.)[6] Incorporating this number into plaintiff's lost revenue model correspondingly reduces plaintiff's projected revenue loss from $1,786,854 to $1,018,528.

A second difficulty we have with plaintiff's lost revenue model is that it identifies 1995 as the year in which plaintiff would first have been required to pay an increase in real estate taxes resulting from the Prestridge's transition from a low-income housing property to a market-rate rental property. According to the trial record, however, property assessments in Prince George's County occur on a three-year cycle, and such an assessment was made on January 1, 1994. Because plaintiff's model assumes that the Prestridge would have been operating as a market-based rental facility and would therefore have been subject to higher real estate taxes as of that date, plaintiff's model incorrectly omits the additional taxes it would have owed during the August 1993—August 1994 period. Plaintiff thus would have owed an additional $75,391 on its 1993 taxes, correspondingly reducing plaintiff's claimed lost revenue by the same amount, i.e., from the recomputed amount of $1,018,528 shown above to $943,137.

The third objection we have to plaintiff's lost revenue model is its valuation date.[7] Initially, Mr. Gutridge took the position that the economic impact resulting from plaintiff's inability to prepay its mortgage was the sum of the claimed annual losses in rent discounted to the date of taking, i.e., August 1991. Using this approach and applying a discount rate of ten percent, Mr. Gutridge determined that the total rent lost over six years—$1,786,854—had a net present value of $1,214,185 as of August 1991. Mr. Gutridge later revised his position, however, adopting the view set forth in *Independence Park Apartments v. United States*, 62 Fed.Cl. 684, 686 n. 1 (2004), that the loss in revenue associated with a temporary taking should be valued instead at the end of the takings period, i.e., August 1997. Using this new approach and applying a 10 percent interest rate (rather than a discount rate), Mr. Gutridge determined that the $1,786,854 in total rent lost over six years, when measured from the end of the takings period, amounted to $2,144,931. It is that amount that plaintiff now seeks.

The law makes clear, however, that the value of property taken is to be measured as of the date of taking. *See, e.g., First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 320, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987) (observing that "the valuation of property which has been taken must be calculated as of the time of the taking"); *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 5, 104 S.Ct. 2187, 81 L.Ed.2d 1 (1984) (noting that where the government physically occupies land without condemnation proceedings, "the owner has a right to bring an 'inverse condemnation' suit to recover the value of the land on the date of intrusion by the Government"). This rule applies equally in the event of a temporary taking. *See Bass Enter. Prod. Co. v. United States*, 133 F.3d 893, 896 (Fed.Cir.1998) (rejecting the trial court's view that compensation for a temporary taking cannot be deter-

---

**6.** The $1,280,543 average of the two conversion cost estimates, amortized over a ten-year period, yields an annual amount for conversion costs of $128,054.30. This amount, when extended over the relevant six-year period, results in a total expenditure of $768,326.

**7.** Defendant additionally challenges the length of the takings period for which plaintiff seeks compensation, arguing that the 17–month period of delay in prepayment between the enactment of HOPE in March 1996 and the prepayment of plaintiff's mortgage in August 1997 is not causal-

ly linked to ELIPHA and LIHPRHA and should not therefore be charged to the government's account. Had plaintiff retained its original right to prepay, however, it could have taken the steps to do so well in advance of the actual prepayment date and therefore would not have experienced any delay in the transition to a market-based rental operation. The complete restoration of its contract right to prepay must thus include the time reasonably necessary for the exercise of that right.

mined until the end of the takings period). The correct date for valuing the taking is thus August 1991—the date plaintiff's right to prepayment was terminated.[8]

Our final difficulty with plaintiff's lost revenue model is the discount factor Mr. Gutridge employed to establish the present value (i.e., the value in 1991) of the revenue lost over the six-year period when access to the private rental market was foreclosed.[9] Defendant maintains that plaintiff's reliance on a 10 percent factor is appropriate for subsidized housing rentals but not for market-based housing rentals since the latter harbors greater risk and must therefore command a higher discount rate. Defendant urges a rate instead of between 10.5 and 11.5 percent.

In support of its position, defendant refers us to the testimony of its two experts, as well as to Mr. Gutridge's 1997 appraisal. Its first expert, Mr. Thorne, testified that while investment-grade apartment buildings commanded a discount rate of 9 to 10 percent during the period in question, a riskier investment like the Prestridge would have

been required to generate a return in the neighborhood of 10.5 percent. Defendant's second expert, Dr. Bret M. Dickey, additionally testified that the Prestridge, as a market-based rental operation, would have taken on greater leverage (i.e., increased mortgage borrowing) and therefore would have warranted a discount rate of 11.5 percent (due to the implicit cost associated with the risks of operating with borrowed capital). Finally, in his 1997 appraisal of the Prestridge, Mr. Gutridge employed a discount rate of 11.5 percent—a figure supported by then-applicable market survey data. Significantly, Mr. Gutridge's use at trial of a 10 percent discount figure lacks any such independent verification.

In light of the above testimony and corresponding documentary record, the court now adopts 10.5 percent as the relevant discount rate. Applying this rate to our adjusted figure of $943,137 (which reflects property conversion costs and additional tax expenses), we reach a value of $640,185, representing the loss of rental income (as adjusted by the court) measured as of the August 1991 date of taking.[10]

---

**8.** The above discussion notwithstanding, we are unconvinced that the parties' dispute as to the valuation date makes a difference from an economic perspective. It simply cannot be the case—and indeed it is not—that the same revenue flow should have different economic values when measured at the end of the period as opposed to its beginning. Plaintiff's initial formulation of its lost revenue model, which discounted the sum of the years' revenue losses to their present value in August 1991, yields a result that is the same in economic terms as plaintiff's revised formulation which increased the value of those flows to their future value in August 1997. To put it most simply, at a constant discount/in-

**10.** The table below shows the court's calculations:

terest rate, a revenue flow worth $1,214,185 in August 1991 is worth $2,144,931 in August 1997. Plaintiff's lost revenue model should not be understood as saying more than this.

**9.** A discount rate refers to the percentage rate applied to calculate the present value of a future income stream, as determined by the current interest rate and by the risks perceived to be inherent in the particular income stream under consideration. A discount rate, in other words, identifies the rate of return an investor would demand given the risk characteristics associated with a particular capital asset.

| | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 |
|---|---|---|---|---|---|---|
| Rent Loss as Calculated by Plaintiff's Expert | 69,444 | 212,107 | 298,946 | 410,907 | 380,723 | 414,727 |
| Less Conversion Costs/Real Estate Taxes | 128,054 | 128,054 | 128,054 75,391 | 128,054 | 128,054 | 128,054 |
| Difference | –58,610 | 84,053 | 95,501 | 282,853 | 252,669 | 286,673 |
| Difference Discounted at 10.5% | 0* | 68,838 | 70,782 | 189,719 | 153,370 | 157,476 |

Total Discounted
Annual Rents: $640,185

* As the table shows, in 1991, conversion costs exceeded the amount of rent loss by $58,610. For the sake

### b. *Adjustments to Plaintiff's Return on Equity Model*

In addition to its lost revenue model, plaintiff attempts to demonstrate the economic impact of the suspended right to prepayment by examining the relationship between the average annual cash distribution paid to plaintiff during the six-year period in question and the equity value of the property (the appraised value of the property less the outstanding mortgage balance) on the date the mortgage was prepaid. In conducting this "return on equity" analysis, Mr. Gutridge determined that the cash distribution, expressed as a percentage of equity, came to 0.086 percent.[11] This 0.086 percent, Mr. Gutridge further determined, provided a rate of return 99 percent less than what plaintiff presumably could have earned during the same time period on a Treasury debt instrument yielding 8.5 percent. According to plaintiff, this diminished rate of return highlights the serious financial harm occasioned by the six-year period of below-market rental rates to which the Prestridge was subjected.

Plaintiff's approach, though similar on its face to the method employed in *Cienega VIII*,[12] erroneously omits other returns on investment that plaintiff received including, for example, $800,000 in mortgage principal payments made over the relevant six-year period. Such payments against the mortgage debt represent growth in plaintiff's ownership stake in the Prestridge realized from business earnings and therefore must be counted along with the cash distributions as monies received. Thus, the proper construct of plaintiff's return on equity model, defendant maintains, is the ratio between the average net operating income and the property's average net equity during the delay period. As Dr. Dickey explained, net operating income is a more comprehensive measure of return—one that "captures all of the returns that City Line received."[13] Defendant calculates that amount as a return on equity of 6.3 percent—a number only 25 percent less than the 8.5 percent return on equity that Mr. Gutridge identified as the appropriate benchmark return.[14] Accepting defendant's revisions to plaintiff's model, we therefore conclude that plaintiff's return on equity during the period in question was 6.3 percent.

### c. *Challenges to Defendant's Economic Impact Model*

As noted above, defendant's expert, Mr. Thorne, calculated a $600,000 decrease in the Prestridge's market value as a result of the enactment of ELIHPA and LIHPRHA—an amount equal to 8.45 percent of the $7.1 million that Mr. Thorne had identified as the Prestridge's fair market value in 1991. Plaintiff disputes those calculations, however, arguing that Mr. Thorne's valuations for Au-

---

of simplicity, we show the difference as "0" rather than as a negative number.

---

**11.** In calculating plaintiff's return on equity, Mr. Gutridge incorrectly employed the figure $5,441 to represent the cash distribution to plaintiff, rather than the $78,839 cash distribution revealed in the record. We make no correction to plaintiff's return on equity calculation, however, because, as explained in the text, we view that calculation as inherently flawed.

**12.** Plaintiff maintains that its return on equity approach falls squarely in line with the approach endorsed in *Cienega VIII* in which the court described its return on equity calculation as a "simple division calculation of the aggregate annual earnings by the aggregate equity on the properties." 331 F.3d at 1343 n. 38. Although we acknowledge the legitimacy of plaintiff's point, we note, however, that in *Cienega VIII*, the court based its findings regarding economic impact on a trial record dedicated to a contract damages model (*i.e.*, lost profits) and thus, presumably on a record that was not focused on the

application of earnings to the enhancement of the business's net worth. In other words, the *Cienega VIII* court had no occasion to consider the mortgage payments we include here.

**13.** The term "net operating income" is defined as "[t]he actual or anticipated net income that remains after all operating expenses are deducted from effective gross income, but before mortgage debt service and book depreciation are deducted ...." Appraisal Institute, *The Appraisal of Real Estate* 484 (12th ed.2001).

**14.** Mr. Gutridge identified $331,770 as the average annual net operating income earned during the delay period and $5,250,301 as the average equity in the property during that same period. Based on these amounts, defendant's expert calculated a return on equity of 6.3 percent (331,770 ÷ 5,250,301 = 6.32%).

gust 1991 and March 1996 are flawed because they improperly include conversion costs, rely on overstated vacancy rates, and inflate the amount of the rental income the Prestridge actually received from 1991 through 1996. A closer look at plaintiff's proposed adjustments, however, reveals them to be without consequence.

First, as discussed above, we believe the conversion costs associated with capital improvements were an essential element to obtaining the competitive market rental rates on which plaintiff's lost revenue model relies. Second, defendant's vacancy rates—11 percent for 1991 and 8 percent for 1996—while not reflective of the industry data plaintiff cites (showing an average vacancy rate of 4.7 percent during the years 1991–1996 for elevator buildings in Washington, DC), correctly address both vacancy rates and credit loss. As Mr. Thorne explained at trial:

> [V]acancy is an interesting and operative term, because there's not only physical vacancy, but there's also credit loss. Many of these apartments in these locations, in these market areas have a substantial amount of defaulting tenants who do not pay their rents on time, and ... may occupy the unit for some time before you can evict those tenants.

So vacancy and credit loss, in my opinion, was 11 percent for this property, and it's really a function of location, age of the product, access to employment centers and the access to public transportation.

Finally, the difference between the rental income Mr. Thorne calculated (based on 2.5 percent annual increases) and the lesser amount plaintiff proposes represents a change in the Prestridge's projected 1991 value from $1,781,672 (as defendant's model shows) to $1,660,877 (as plaintiff's revised numbers indicate), in turn reflecting a diminution in the property's value of 9.86 percent rather than defendant's original 8.45 percent.[15] As we go on to explain below, however, the difference is insufficient to transform a regulatory constraint into a regulatory taking.

### d. The Assessment of Economic Impact

In sum, the parties have offered three different models for consideration by the court in assessing the economic impact attributable to defendant's six-year suspension of plaintiff's prepayment right. The first of these models, plaintiff's lost revenue model (as modified by the court), reveals a loss of rental income measured as of the date of the August 1991 taking of $640,185, a figure that equates to approximately a one-third reduction in the net operating income the Prestridge would have realized had prepayment occurred in 1991.[16] The second model, plain-

---

**15.** As explained in footnote 5 above, defendant originally calculated the 8.45 percent diminution in the Prestridge's value according to the following formula:

(a) Fair market value of the Prestridge in 1991 ............ $7,100,000

(b) Fair market value of the Prestridge in 1996 ($7,800,000) discounted at 10.5 percent to obtain value of the property in 1991 ........................ $4,734,599 (rounded to $4,700,000)

(c) Sum of annual net operating income earned from HUD rents during 1992–1996 ($2,371,102) discounting each year at 10.5 percent to obtain cumulative discounted value in 1991 ...... $1,781,672 (rounded to $1,800,000)

$$\frac{a - (b + c)}{a} = \text{diminution in value.}$$

Thus:
$$\frac{7,100,000 - (4,700,000 + 1,800,000)}{7,100,000} = .0845.$$

Adjusting that calculation for the rents plaintiff contends it received, results in the following:

(c) Sum of annual net operating income earned from HUD rents during 1992–1996 ($2,111,673) discounting each year at 10.5 percent to obtain cumulative discounted value in 1991 ..... $1,660,865 (rounded to $1,700,000)

$$\frac{7,100,000 - (4,700,000 + 1,700,000)}{7,100,000} = .0986$$

where the $1,660,865 represents the following annual rents discounted by a factor of 10.5 percent:

1992: $491,098 ($444,433)
1993: $442,623 ($362,501)
1994: $473,315 ($350,803)
1995: $420,192 ($281,837)
1996: $364,567 ($221,292).

(The numbers in parentheses identify the present value calculated by the court.)

**16.** The one-third reduction in rent is based on the annual net operating income from HUD rents shown in Mr. Gutridge's 2004 report. The sum of those yearly amounts ($1,990,622) discounted

tiff's return on equity model (as modified by the court), reveals a return on equity of 6.3 percent, a figure that represents a rate of return approximately 25 percent less than the 8.5 percent return on equity that plaintiff's expert identified as the appropriate benchmark return. The third and final model introduced by the parties, defendant's economic impact model (as modified by the court), shows a diminution in value of the Prestridge as a whole of $700,000, or approximately 10 percent of the property's value in August 1991. Taking all three models into account, the question is whether the economic impact is sufficient to classify the suspension of the prepayment right as a compensable taking. The answer is no.

■ "A statute regulating the uses that can be made of property effects a taking if it 'denies an owner economically viable use of his land.'" *Hodel v. Virginia Surface Mining and Reclamation Ass'n*, 452 U.S. 264, 295–96, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981) (quoting *Agins v. City of Tiburon*, 447 U.S. 255, 260, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980)). But "mere diminution in the value of the property, however serious, is insufficient to demonstrate a taking." *Concrete Pipe*, 508 U.S. at 645, 113 S.Ct. 2264.

■ Evaluated in light of these legal standards, we are unable to conclude that plaintiff has suffered economic injury sufficient to support a finding of a compensable taking. At most, the evidence demonstrates that plaintiff was compelled to operate less profitably than it otherwise would have operated had prepayment been permitted in August 1991. While the value of the Prestridge was therefore diminished, its operation remained an economically viable undertaking. In terms of economic impact, then, extinguishment of the right to prepayment cannot be viewed as the functional equivalent of a taking of property.

We are thus left to decide whether the *Penn Central* factors, taken together, warrant a finding of a compensable taking under the Fifth Amendment. Although the interference with plaintiff's right to prepay its mortgage was a legislative action that subordinated private rights to public needs and adversely affected distinct investment-backed expectations in property, the economic impact of that action did not occasion serious financial loss—the investment in the Prestridge remained an economically viable undertaking. Taking all three factors into consideration, then, we are compelled to conclude that the limitations placed on plaintiff by ELIPHA and LIHPRHA cannot be regarded as so burdensome as to constitute a taking of property.

### CONCLUSION

For the reasons set forth above, the court concludes that no regulatory taking resulted from the enactment of ELIPHA and LIHPRHA. Accordingly, the Clerk is directed to enter judgment dismissing plaintiff's complaint.

to 1991 values is $1,401,806. Adding the net income actually realized ($1,401,806) to the net income determined to have been lost ($640,185) results in the total net income that would have been realized—$2,041,991. Expressed as a ra-

tio, the lost revenue represents 31.4 percent of the net operating income that would have been realized had prepayment occurred in 1991 (640,-185 ÷ 2,041,991 = 31.4%).